Thank you, Mr. Clerk. Good morning. Please be seated. Okay, the first case this morning is case number 4150496, People v. Cunningham for the appellant, John McCarthy, for the appellee, Linda McClain. Mr. McCarthy, you may proceed. Excuse me. Your Honors, may it please the Court. My name is John McCarthy, and I'm with the Office of the State Appellate Defender with the Fourth Justice Office. I'm here on behalf of DeMarco Cunningham. I filed a two-issue brief. I'm going to focus my attention on the first issue, but I would like to comment that I don't think the ineffective assistance of counsel claim ever happens if it wasn't for the error in the first issue, which is excessive other crimes evidence. Justice Potter Stewart is often quoted as saying, I may not be able to find obscenity, but I know it when I see it. Now, I may not be able to find the precise moment when admissible other crimes evidence crosses over into the inadmissible mini-trial, but I know it when I see it, and I see it in this case, and I see it primarily for one reason, redundancy. If the Court would allow me, I'd like to take 30 seconds to a minute to give a skeleton outline of the evidence in this case, and I think you'll begin to understand my position. When it comes to Isaiah Wiley's murder, the State offered eight witnesses and 13 phone calls between DeMarte and Kendricks discussing fixing the house. When it comes to the attempt bribery of Isaiah Wiley, the State offers three witnesses, a certified copy of the conviction, nine calls of DeMarte discussing paying Wiley to change the story, a 30-minute tape of Wiley in which he talks about DeMarte trying to bribe him to change the story, and Miranda Garsh, who also testifies about the phone call and the fact that my client was trying to bribe Isaiah Wiley. Now, when it comes to the murders of Central and Freedom Cunningham, the individuals he's on trial for, the State presented 17 witnesses. However, the vast majority of them were investigators, forensic scientists, people who found evidence afterwards. The State's case really boils down to three main witnesses, and one of those witnesses is the taped statement of Isaiah Wiley. One of those witnesses is Brian Cunningham, who attempts to tie my client to the gun, and the third witness is Miranda Garsh, who provides some motive. In that backdrop, I'd like to now discuss the murder of Isaiah Wiley and why I think there was too much evidence presented. I would like to present a scenario to the Court on the way I think the State should have proceeded and still accomplishes their goal without shifting the focus of the jury from the other crimes, from the crimes on trial for the other crimes. Do you have any authority for the position that, apparently, if you can come up with other ways for the State to prosecute their case, that you feel aren't quite as damaging that they're supposed to do that? I'm not saying my theory is less damaging. I have authority for the fact that you can't conduct a mini-trial and what the State did here in the way they proceeded they did. You also essentially argue that, well, they didn't have to put on all of this other evidence, as if you have some say in how the State prosecutes their case. That is not what I'm saying at all, Your Honor. What I'm saying is I'm trying to explain to the Court that other crimes' evidence only becomes a mini-trial if all of the parts are necessary to prove what the State needs to prove for the reason they need to prove it. And I just want to demonstrate to the Court quickly on how this could have been done highly effectively and not shifted the focus of the jury. They could have called, instead of eight witnesses, they could have called three. Instead of 13 phone calls, they could have used four or five. The first phone call was on November 11th when they started talking about fixing the house. You could lay that as groundwork. Then there's two key phone calls on November 27th and 29th when they're talking about fixing the house. And Kindred says, I can't get the house done because the owner has blood clots. Now, the State has evidence to support that through the testimony of Erica Bobbitt, who's a nurse at the hospital, who could testify that Isaiah Wiley was in the hospital from November 23rd to November 29th, this precise time. Another key phone call happens between Demarte and several people passing the phone around on December 7th when he says, hey, man, you've got to watch the news tomorrow. Something good is going to happen. Well, on December 8th, nothing happens. But on December 9th, Demarte gets a phone call from Kendrick saying, dude, I'm sorry. I couldn't get the house done yesterday like I promised. Something came up. And then Isaiah Wiley is killed on the 9th. I think you have effectively laid out the State's theory to the jury with just those phone calls and just those witnesses. Why wouldn't the other phone calls, the ones that related to apparently an effort to get Wiley to change, to recant his statement, and a rather persistent effort to have that done or accomplished, why isn't that a prelude to taking more extreme measures? I mean, isn't that a very strong inference to be drawn from those earlier, from those other contacts? I think, let the jury know that there was 13 contacts in this time period. But when most of the phone calls just repeat the same information over and over again and don't add any evidentiary value, the phone call on the 27th and 29th add evidentiary value because it shows that he's not completing the house because the owner has blood clots and Wiley is sitting in the hospital. The last couple of pieces have value because it shows that Kendrick was supposed to kill, not kill, was supposed to fix the house on December 8th and Demarte expected him to fix the house on the 8th but he didn't get to it until the 9th. And you could also have Tempest-Rawls testify, I'm sorry I forgot her, the third witness, because she actually witnesses the shooting and identifies Demarte, not Demarte, Kendrick's. But on that issue, the State also called a gentleman, I think his name was William, who witnessed the shooting but he couldn't identify Wiley, not Wiley, Kendrick's. So it was just another redundancy. And this issue is preserved for the court. There is a motion to eliminate litigated and is included in the post-trial motion. And the State has to show that it was harmless, a harmless error. I don't believe they can in this case, but I'm going to save that part of the argument until later, unless the court wants to hear it, when I discuss the actual evidence and the Cunningham murders. The witness tampering case, here's my problem with this piece of evidence. You have a certified copy of a conviction, that proves he tampered with a witness, witness tampering. You have nine calls with Demarte discussing paying Wiley to change his story. You have Miranda Garz testifying about the phone calls and wanting to get the story changed. You have a 30-minute tape of Wiley's statement to police about the attempted bribe. Now that's redundancy after redundancy, and that's precisely what's not allowed. The State has to pick a lane. It's not me telling the State how to run their case, it's me explaining that you can't have a mini-trial. And you have four pieces of evidence all covering the same thing, adding nothing. And that improperly shifted the State's focus from what he was on trial to, to what the other crime's evidence was. Now I'd like to get to the murder of Freedom Central Cunningham, and when I discuss that evidence, oh, and by the way, the witness tampering is not preserved, so it has to be under the plain error analysis. And I'll be discussing why I believe this is a closely balanced case, along with the other arguments. Only eight witnesses, if you include the video of Wiley's statement to police, were occurrence witnesses in some form. Now it's important to know there are no eyewitnesses to the crime, no physical evidence tying Demarte to the weapon. It's based on testimony. And as far as tying Demarte to the weapon, it comes from two people. He had the video of Wiley's statement to police, which is probably the State's best evidence, and he had the testimony of Brian Cunningham, who is not the State's best evidence. Now, during this videotape, he claims Demarte confessed to him. He's not claiming he witnessed the murder, but he's claiming Demarte had confessed to him a couple months before, that Demarte had a gun with an extended clip, and that Freedom had stolen some money from Demarte, and that's why he was mad at him. Even though he wasn't present at the trial, he was impeached at least three times over. One hour prior to giving this statement to police, which is several months after the murder, Demarte had just got done beating him up. When Wiley... All of that was known prior to the fact. Yes, it was. So they've made that assessment already, whether that was credible evidence or not. But they've made that assessment in the context of having too much other crimes evidence. We don't know how they... We can't predict how a jury will assess the credibility if only proper evidence is before them. All we have is dry pieces of paper we're reading. And each time that there was other crimes evidence, the court instructed the jury as to the purpose of this evidence, correct? No, it didn't. He did it three times out of 14 or 15. Okay. And in particular, when it comes to Tempest, Rawls, who actually identifies Kendrick as the killer, she's the first witness of that session, and that instruction isn't read. The second way Wiley is impeached in this statement is he is told by police, you're going nowhere because you're under arrest because we believe you're obstructing our investigation into the murder of Freedom of Central Cunningham. And the third way he's impeached is Wiley is also upset with DeMarte because he won't promote him from being a lookout to a drug dealer. Lookouts only make $40 or $50 a day. Drug dealers make a lot more, and he has a child on the way. Now, Brian Cunningham, who also testifies and puts the weapon, and says that DeMarte had that kind of weapon, was the brother of one of the murder victims. He hated DeMarte. They got into a fight that was so fierce they nearly bit his thumb off. And he's in prison at the time, and he told Brenda Johnson after DeMarte had gotten arrested, I hate that guy. I'm going to make sure he goes to prison. So there is a credibility problem there also. Now, the police attempt to, or the state attempts to put my client in the vicinity through the testimony of Rekia Alston and Chanel Young and Tyrius Oldham, and then, of course, Wiley's video. And there's some phone evidence they introduced that I will address in a second. All Chanel Young saw was two guys get out of a car dressed all in black. Rekia Alston and Tyrius Oldham testified that DeMarte came to the door. And I'm not contesting that DeMarte didn't do that. He went upstairs, talked to Wiley, and he leaves. And somewhere between five and ten minutes later, the murders occurred. But what's interesting about Rekia Alston, who is one of the state's witnesses, she says that DeMarte had on a red coat. And so he's not one of two people who were dressed in all black that got out of the car about a block down the way. The phone, okay. That, to me, is not direct evidence that DeMarte was in the area where the shooting took place for two reasons. First, the way they decided that the phone they were tracking was DeMarte's is a little convoluted. They never recovered the phone, that phone. But they looked at Wiley's phone and determined that the top number was 330-0897. They had arrested DeMarte in March of another crime and had another phone number that ended with 9810. And so they subpoenaed the documents, and they found out that seven of the top ten numbers were the same. And that led the police officer to conclude it must be the same person. I don't know on what basis that opinion comes from. You have a large criminal drug conspiracy going on here. A lot of people probably using burner phones for the business, and a lot of those people could possibly have seven of the same top ten numbers. I mean, I think that's speculation. The second part of it, they can only put the phone into about a third of the city of Decatur. It doesn't put DeMarte at the scene of the crime or at the scene of the murder. He could be anywhere in several square mile radius. So I don't think the state's case is strong enough to survive the other crimes' evidence. I think the jury's focus was shifted away from the evidence before them. The evidence they did present has credibility problems. I think those credibility problems are whitewashed with the other crimes' evidence. I believe my client deserves a new trial based on that. I will quickly address the second issue unless there's any more questions on the first one. The other crimes' evidence was used to prove identity, correct? No, it was used to prove consciousness of guilt. At least that's what the jury was told. Well, if the state could have used, as you say, only four or five of the phone calls to prove that fixing the house was code words for killing Wiley, was there any prejudice that they could have done that with four or five? So what if they used them? Well, I think the focus at this point when you have error, the focus becomes is the properly admitted evidence closely balanced or not? Well, it seems like to me to follow your argument logically, if you're saying four or five calls would have been enough, I don't see where there's any – you said that harmless error became an issue. I don't see where there is a problem. Well, the Illinois Supreme Court and people v. Tate specifically stated that when you're determining whether evidence is closely balanced, you don't look at it to see if the state could still get a conviction. You look at it to see if the evidence as presented is relying on credibility of witnesses. And if it's relying on the credibility of witnesses, it is by its very nature closely balanced. And my client has a right to have a trial that's in front of a jury that only hears the amount of other crimes' evidence it should. There was literally more other crimes' evidence introduced in this case than there was evidence tying DeMarco Cunningham to this crime. At some point, it has to be too much. And you're saying it's only offered to show consciousness of guilt? I thought it was offered to show also the identity of the defendant as the person responsible. I could be wrong. It doesn't matter if it's for identity or consciousness of guilt. To me, that's pretty much the same. Well, it seems to me that consciousness of guilt would encompass identity. That's where I was coming from. But I understand this court's concerns, but I think the problem here is we do have an error. And you shouldn't look at the error to try to determine whether the state would still get a conviction. I think you look at it, what is the evidence based on? And it's based on credibility. We shouldn't make the mistake that we're trying to keep juries away from doing, well, if he had Wiley killed, then he had to have done this crime too. That's what we want to avoid with other crimes evidence. So I don't think we should go down that path. Are there any questions on the second issue? The second issue. It's ineffective. This is a counsel for asking the detective's opinion on whether he thought working on a house. Yeah, I have a question. Was that the only evidence that was in the record that tied the fixing of the house up with the killing of Wiley? As I said, I think you could make a circumstantial case with those four phone calls I talked before. But I think putting the force of a police officer behind it I think really hurt. The defendant had witnesses himself to testify about the innocent explanation for those phone conversations, didn't he? Well, if they were put in a position where they had to, there was so much of it, they couldn't ignore it. Well, they didn't suddenly run out and grab him. They obviously had these people ready and prepared to testify because they were there as witnesses. So it's not like, oh, my gosh, this is a big surprise. We need to go find somebody to explain this. This is clearly something that the defense counsel had planned to do, wasn't it? Because of what he received in discovery and because of the ruling on the motion to eliminate, he knew how much evidence the state was going to present. Okay. So he had to defend it at that point. So it's not a surprise, I'm arguing about. That's my point. It was not a surprise. It wasn't something that he just inadvertently blurted out and it was a big mistake. It was part of his plan to establish that there was an innocent explanation that this witness, this officer, is clearly biased and prejudiced against this defendant. He's going to come up with an explanation that shows evidence of guilt when, in fact, had he done a little bit more investigation, he could have found that there's a perfectly innocent explanation to all of this. Why isn't that just a good trial tactic? May I answer your question? Asking the office of opinion is bad trial tactics, especially when you've already asked the officer, did you know that DeMarte owned several properties? And he says, no. Did you know that DeMarte, did you investigate whether DeMarte was working on any of those properties? And he said, no. Who cares what his opinion is at that point? You've established there's a possible explanation and laid the groundwork for your witnesses. Thank you. You'll have rebuttal. Ms. McClain. May it please the court. Counsel. The state is arguing that the trial court did not err in admitting the other crime's evidence of the attempted bribery and murder of the state's key witness. First, the evidence of defendant's attempt to get Wiley to change his statement is waived, as that was not included in the post-trial motion. And I know my opponent is arguing plain-air exception, and the state is responding that the evidence was not closely balanced, so plain-air should not apply. On the merits, this evidence was detailed only to the extent necessary to prove guilty knowledge and identity. And the jury was instructed in this case that the evidence was going to be for guilty knowledge and identification. Was it just guilty knowledge? And the evidence did not go beyond what was necessary. It was not presented in excruciating detail. None of the witnesses were cumulative. The witnesses were factual and relatively brief. Some of the witnesses' testimony is only four pages long. Some of them, for example, were just like the first officer on the scene or the person who went to the hospital to retrieve evidence. So a lot of the witnesses were just, you know, necessary to present the case. While some witnesses corroborated the testimony of other witnesses, the trial court did not abuse its discretion in admitting the evidence. In fact, the prosecutor carefully limited the evidence by deciding not to introduce how the Wiley murder weapon had been found. In addition, to the extent that the evidence presented was, in addition, the extent of the evidence presented was, in part, a response to defendant's theory that he, that defendant had no part in Wiley's murder. Also, there is no rule that requires the State to present a watered-down version of the events simply because otherwise highly probative evidence is unflattering to the defendant. The lengths that defendant would go to to cover up his murder of Freedom and Central is not shown just by the truncated evidence that defendant presents. Counselor? Yes, sir? Do you think this was a trial within a trial? No, I don't. Why not? I think that the prosecutor carefully presented evidence concerning the Freedom and Central murder case first. Then it went and showed evidence of guilty knowledge and identification because there was no direct evidence that Freedom and Central had been murdered by defendants. Okay. I think counsel said in his brief someplace that the only thing short of this being a murder trial as to Wiley's murder was the fact that they didn't put on the cause of death. What do you say to that? I think that they had to show guilty knowledge and identification. So they showed what lengths defendant went to to cover up his crime. He beat up Wiley. There's no objection to that evidence. Then he solicited several people to try to get Wiley to change his statement to the police. In fact, Wiley's statement to the police was admitted by, under the statutory exception for, intentional murder of a witness or forfeiture by wrongdoing. And that has not been objected to. That's before the court. Then defendant called Kendrick and had Kendrick kill Wiley. So all of that evidence shows to the extent that defendant was desperate enough to do all this stuff to cover up his crime. I think that the jury was entitled to know all of that. And I don't think it was excessive because a lot of the witnesses were only four pages long. They just testified to, I gathered this evidence from the hospital. I gathered this evidence at the scene of the crime. I was the first officer on the scene. A lot of the witnesses were necessary to present the case, but not like, you know, defendant is guilty. So in this case, I'm disagreeing with my opponent opposing counsel. I think that the limiting instruction was given six times. It was given before the testimony of the officer responding to the Wiley beating. It was given before inmate Deppenbach testifying to the bribe. Defendant said he'd bribe him to shut Wiley up. It was given prior to Wiley's recorded statement to the police. It was given prior to the testimony of the first officer responding to the murder of Wiley. And then there were several witnesses after that. And it would have been repetitive to give the instruction after each four-page witness. It would have been just too much. And it was given prior to the testimony about Kindred's calls. And then it was given as a jury instruction. A procedure of cautioning the jury to consider the evidence only for the limited purpose substantially reduced the potential prejudicial impact of such evidence. And I'm also disagreeing with my opponent. The evidence against defendant was overwhelming. In Wiley's July 6th statement to police, he said that five minutes prior to the shooting, defendant came by and said Freedom was coming over to pick up some heroin. After the shooting, Wiley called defendant and defendant was out of breath. Defendant fled to Indianapolis for a month and a half. Defendant told Wiley in confidence that he had shot them both and gave specific details such as that Freedom had stolen $15,000 from him, giving a motive. Defendant used a 9mm handgun with a 32-round magazine, which is an unusual type of a weapon. He shot Freedom first, then Central, and then shot Freedom again to make sure he was dead. All of that came in through Wiley's statement to the police, which has not been an issue on appeal. The testimony of Oldham and Alston, they were also at the house, was that defendant was at the scene of the homicide 10 minutes prior to the shooting. And then there's calls from and the location of defendant's phone around the time of the double murder. I think that the officers were able to state that defendant's phone was home, in the area of his home, then it was in the area of the homicide at the time of the homicide, then it went back to the area of his home. And there was evidence concerning the murder weapon and a similar weapon being in defendant's possession just days prior to the shooting. That was from not only Wiley's statement, but also Freedom's brother. Defendant beat up witness Wiley. That's not been objected to. And that was after the shooting, he beat up Wiley. Wiley's statement to the police on July 25, in which he said he'd been solicited by defendant to change his statement. That was admitted into evidence under the forfeiture by wrongdoing. And the motive evidence that defendant told Miranda Garst that he took $10,000 loss because Freedom was robbed. With all this evidence against defendant, which I find to be, I believe it to be overwhelming, the risk that the jury found defendant guilty, in part because he was a bad person for doing these other offenses, is especially low. Are there any other questions? What do you make of defense counsel asking the question from the detective, which allowed him to express his opinion that fixing up the house meant killing Wiley? I think that was all a strategic move by defense counsel. What strategy would that be? He knew what conclusion the prosecutor was going to make in closing argument. And he wanted to set up his defense... Did the prosecutor in opening argument say that we're going to present evidence which will allow you as reasonable people to infer that when defendant spoke of fixing up the house, he was actually talking about killing Wiley? The prosecutor did not say that. So really the only thing in front of the jury, other than the fact that they can draw reasonable inferences from the evidence presented, was the opinion that defense counsel elicited from the witness that said that indeed fixing up the house was a reference to killing Wiley, right? That seems pretty damaging. Did the defense mention it in his opening? Defense did mention it in opening. Defense said, you will hear the prosecutor's witness. I think he told the jury that they would hear inmate calls, which the prosecution was interpreting as fixing up the house to mean go kill Wiley. So it was part of the plan from the beginning of the trial. Exactly. This had all come out in a motion in limine. So the defense counsel knew what was going to happen. It was all going to be tied up in closing argument, and he tried to head it off. He tried to analyze that opinion and cut it up. And he did that by asking questions like, he asked questions like, have you gone to the scene and seen that there are repairs that need to be made? Did you know that defendant owned houses that he repaired? There was a call eight days after the shooting talking about fixing a house. How can that mean killing Wiley if it's eight days after he's already been killed? Questions like that. He tried to take that opinion apart. Those sound like good questions as long as they were asked in leading form. But then why, after you've asked those, ask for the opinion? I don't see how that adds to the defense at all. I think he threw out, he asked, he, in his questioning, he was like trying to analyze the opinion and cut it apart. So he got the opinion before the jury, and then he picked it apart. And then toward the end of his questioning, he lost control of the witness, and the witness started blurting like, I can't remember, but he said, when defense counsel objected to the answer going to the ultimate decision, Daly said he gained his opinion from the totality of the circumstances, and there was any ads. There's no doubt in my mind the calls were discussing the murder. And the objection there is sustained. The court instructed the jury to disregard that personal opinion. So I think that defense counsel had a plan. Why do you think the court sustained that objection? I think that at that point, Daly, he did not answer the question. I think the question was, how do you get a gun out of those words? And Daly said he gained his opinion from the totality of the circumstances, and there was no doubt in his mind the calls were discussing the murder of Wiley. I think the detective's answer did not answer the question that was posed by defense counsel at that point. So I think that's why it was sustained. Not because it was an improper opinion offered by the witness? I think that it wasn't. I think the prior questions were asked by defense counsel, and he opened the door. But I think he had a strategic reason to do that. Okay. I'd also ask the court to affirm defendant's conviction. And are there any other questions? I don't see any. Is there any rebuttal? Yes, sir. I'll be brief. I won't pick apart piece by piece what the state says the evidence was. The recitation of the evidence that they gave is in the light most favorable to the state. It disregards all of the evidence I discussed that impeached these witnesses. When you're deciding whether a case is closely balanced, you have to look at both sides of the argument. The statutory, this was brought in under statutory forfeiture by wrongdoing. That's a moot point at this juncture. The Illinois Supreme Court has ruled that violated the separation of powers. And so we're arguing that's under the common law rule. Common law rule. And the strength of the state's case depends on, if you believe what Wiley says. And as I mentioned, he's impeached several times. The state says that my client. When a defendant goes to such great lengths to get a critical witness to change his story, and then when unsuccessful, recruits somebody to kill him, why isn't that evidence relevant and admissible? I never challenge the admissibility of the other crimes after this. I challenge the amount of evidence. Well, you challenge all of the evidence that relates to the efforts that are made to get him to change his story, going to beat him up personally, and then ultimately recruiting somebody to kill him. If the defendant himself provides this level of evidence to the state, then why is that not now admissible against him? Well, first of all, he beat Wiley up before Wiley even gave the statement. It was an hour before he gave the statement, which is one of the reasons Wiley might lie. Or maybe he already knew that Wiley was going to give the statement. No, the evidence that was presented, the only reason Wiley makes a statement is police arrive and they arrest him for obstructing justice. My client allegedly, well, he beat him up. I'm not disputing that. But the reason was he thought he'd stolen a gun from him. It had nothing to do with the murders. So it gives Wiley a potential motive to lie, but it has nothing to do with this case. If there's no further questions. I don't see any. Thanks to both of you. The case is submitted. Court is in recess.